℧JS 44 (Rev. 12/07, NJ 5/08)

# CIVIL COVER SHEET

The JS 44 civil cover sheet and the information contained herein neither replace nor supplement the filing and service of pleadings or other papers as required by law, except as provided by local rules of court. This form, approved by the Judicial Conference of the United States in September 1974, is required for the use of the Clerk of Court for the purpose of initiating the civil docket sheet. (SEE INSTRUCTIONS ON THE REVERSE OF THE FORM.)

## I. (a) PLAINTIFFS

Angela Posey, individually and on behalf of all others similarly situated

**DEFENDANTS**

Building Materials Corporation of America d/b/a GAF Materials Corporation

**(b)** County of Residence of First Listed Plaintiff   Kershaw County, SC

County of Residence of First Listed Defendant   Passaic County, NJ

NOTE: IN LAND CONDEMNATION CASES, USE THE LOCATION OF THE LAND INVOLVED.

**(c)** Attorney's (Firm Name, Address, Telephone Number and Email Address)

Berger & Montague, P.C.
1622 Locust Street
Philadelphia, PA 19103
(215)-875-3035, pmadden@bm.net

Attorneys (If Known)

## II. BASIS OF JURISDICTION (Place an "X" in One Box Only)

- ☐ 1 U.S. Government Plaintiff
- ☐ 3 Federal Question (U.S. Government Not a Party)
- ☐ 2 U.S. Government Defendant
- ☒ 4 Diversity (Indicate Citizenship of Parties in Item III)

## III. CITIZENSHIP OF PRINCIPAL PARTIES (Place an "X" in One Box for Plaintiff and One Box for Defendant)
(For Diversity Cases Only)

| | PTF | DEF | | PTF | DEF |
|---|---|---|---|---|---|
| Citizen of This State | ☐ 1 | ☐ 1 | Incorporated or Principal Place of Business In This State | ☐ 4 | ☒ 4 |
| Citizen of Another State | ☒ 2 | ☐ 2 | Incorporated and Principal Place of Business In Another State | ☐ 5 | ☐ 5 |
| Citizen or Subject of a Foreign Country | ☐ 3 | ☐ 3 | Foreign Nation | ☐ 6 | ☐ 6 |

## IV. NATURE OF SUIT (Place an "X" in One Box Only)

| CONTRACT | TORTS | | FORFEITURE/PENALTY | BANKRUPTCY | OTHER STATUTES |
|---|---|---|---|---|---|
| ☐ 110 Insurance | **PERSONAL INJURY** | **PERSONAL INJURY** | ☐ 610 Agriculture | ☐ 422 Appeal 28 USC 158 | ☐ 400 State Reapportionment |
| ☐ 120 Marine | ☐ 310 Airplane | ☐ 362 Personal Injury - Med. Malpractice | ☐ 620 Other Food & Drug | ☐ 423 Withdrawal 28 USC 157 | ☐ 410 Antitrust |
| ☐ 130 Miller Act | ☐ 315 Airplane Product Liability | ☐ 365 Personal Injury - Product Liability | ☐ 625 Drug Related Seizure of Property 21 USC 881 | | ☐ 430 Banks and Banking |
| ☐ 140 Negotiable Instrument | ☐ 320 Assault, Libel & Slander | ☐ 368 Asbestos Personal Injury Product Liability | ☐ 630 Liquor Laws | **PROPERTY RIGHTS** | ☐ 450 Commerce |
| ☐ 150 Recovery of Overpayment & Enforcement of Judgment | ☐ 330 Federal Employers' Liability | | ☐ 640 R.R. & Truck | ☐ 820 Copyrights | ☐ 460 Deportation |
| ☐ 151 Medicare Act | ☐ 340 Marine | **PERSONAL PROPERTY** | ☐ 650 Airline Regs. | ☐ 830 Patent | ☐ 470 Racketeer Influenced and Corrupt Organizations |
| ☐ 152 Recovery of Defaulted Student Loans (Excl. Veterans) | ☐ 345 Marine Product Liability | ☐ 370 Other Fraud | ☐ 660 Occupational Safety/Health | ☐ 840 Trademark | ☐ 480 Consumer Credit |
| ☐ 153 Recovery of Overpayment of Veteran's Benefits | ☐ 350 Motor Vehicle | ☐ 371 Truth in Lending | ☐ 690 Other | **SOCIAL SECURITY** | ☐ 490 Cable/Sat TV |
| ☐ 160 Stockholders' Suits | ☐ 355 Motor Vehicle Product Liability | ☐ 380 Other Personal Property Damage | **LABOR** | ☐ 861 HIA (1395ff) | ☐ 810 Selective Service |
| ☐ 190 Other Contract | ☐ 360 Other Personal Injury | ☒ 385 Property Damage Product Liability | ☐ 710 Fair Labor Standards Act | ☐ 862 Black Lung (923) | ☐ 850 Securities/Commodities/ Exchange |
| ☐ 195 Contract Product Liability | | | ☐ 720 Labor/Mgmt. Relations | ☐ 863 DIWC/DIWW (405(g)) | ☐ 875 Customer Challenge 12 USC 3410 |
| ☐ 196 Franchise | | | ☐ 730 Labor/Mgmt.Reporting & Disclosure Act | ☐ 864 SSID Title XVI | ☐ 890 Other Statutory Actions |
| **REAL PROPERTY** | **CIVIL RIGHTS** | **PRISONER PETITIONS** | ☐ 740 Railway Labor Act | ☐ 865 RSI (405(g)) | ☐ 891 Agricultural Acts |
| ☐ 210 Land Condemnation | ☐ 441 Voting | ☐ 510 Motions to Vacate Sentence | ☐ 790 Other Labor Litigation | **FEDERAL TAX SUITS** | ☐ 892 Economic Stabilization Act |
| ☐ 220 Foreclosure | ☐ 442 Employment | **Habeas Corpus:** | ☐ 791 Empl. Ret. Inc. Security Act | ☐ 870 Taxes (U.S. Plaintiff or Defendant) | ☐ 893 Environmental Matters |
| ☐ 230 Rent Lease & Ejectment | ☐ 443 Housing/ Accommodations | ☐ 530 General | | ☐ 871 IRS—Third Party 26 USC 7609 | ☐ 894 Energy Allocation Act |
| ☐ 240 Torts to Land | ☐ 444 Welfare | ☐ 535 Death Penalty | **IMMIGRATION** | | ☐ 895 Freedom of Information Act |
| ☐ 245 Tort Product Liability | ☐ 445 Amer. w/Disabilities - Employment | ☐ 540 Mandamus & Other | ☐ 462 Naturalization Application | | ☐ 900 Appeal of Fee Determination Under Equal Access to Justice |
| ☐ 290 All Other Real Property | ☐ 446 Amer. w/Disabilities - Other | ☐ 550 Civil Rights | ☐ 463 Habeas Corpus - Alien Detainee | | ☐ 950 Constitutionality of State Statutes |
| | ☐ 440 Other Civil Rights | ☐ 555 Prison Condition | ☐ 465 Other Immigration Actions | | |

## V. ORIGIN (Place an "X" in One Box Only)

- ☒ 1 Original Proceeding
- ☐ 2 Removed from State Court
- ☐ 3 Remanded from Appellate Court
- ☐ 4 Reinstated or Reopened
- ☐ 5 Transferred from another district (specify)
- ☐ 6 Multidistrict Litigation
- ☐ 7 Appeal to District Judge from Magistrate Judgment

## VI. CAUSE OF ACTION

Cite the U.S. Civil Statute under which you are filing (Do not cite jurisdictional statutes unless diversity):
Class Action Fairness Act: 28 U.S.C. § 1332(d)

Brief description of cause:
Consumer Class Action/Breach of Warranty

## VII. REQUESTED IN COMPLAINT:

☑ CHECK IF THIS IS A CLASS ACTION UNDER F.R.C.P. 23

DEMAND $

CHECK YES only if demanded in complaint:
JURY DEMAND: ☑ Yes ☐ No

## VIII. RELATED CASE(S)

(See instructions):

JUDGE _____ DOCKET NUMBER _____

Explanation:

DATE

08/03/2011

SIGNATURE OF ATTORNEY OF RECORD

JS 44 Reverse (Rev. 12/07, NJ 1/08)

# INSTRUCTIONS FOR ATTORNEYS COMPLETING CIVIL COVER SHEET FORM JS 44

### Authority For Civil Cover Sheet

The JS 44 civil cover sheet and the information contained herein neither replaces nor supplements the filings and service of pleading or other papers as required by law, except as provided by local rules of court. This form, approved by the Judicial Conference of the United States in September 1974, is required for the use of the Clerk of Court for the purpose of initiating the civil docket sheet. Consequently, a civil cover sheet is submitted to the Clerk of Court for each civil complaint filed. The attorney filing a case should complete the form as follows:

**I.**     **(a) Plaintiffs-Defendants.** Enter names (last, first, middle initial) of plaintiff and defendant. If the plaintiff or defendant is a government agency, use only the full name or standard abbreviations. If the plaintiff or defendant is an official within a government agency, identify first the agency and then the official, giving both name and title.

    (b) County of Residence. For each civil case filed, except U.S. plaintiff cases, enter the name of the county where the first listed plaintiff resides at the time of filing. In U.S. plaintiff cases, enter the name of the county in which the first listed defendant resides at the time of filing. (NOTE: In land condemnation cases, the county of residence of the "defendant" is the location of the tract of land involved.)

    (c) Attorneys. Enter the firm name, address, telephone number, and attorney of record. If there are several attorneys, list them on an attachment, noting in this section "(see attachment)".

**II.**     **Jurisdiction.** The basis of jurisdiction is set forth under Rule 8(a), F.R.C.P., which requires that jurisdictions be shown in pleadings. Place an "X" in one of the boxes. If there is more than one basis of jurisdiction, precedence is given in the order shown below.

United States plaintiff. (1) Jurisdiction based on 28 U.S.C. 1345 and 1348. Suits by agencies and officers of the United States are included here.

United States defendant. (2) When the plaintiff is suing the United States, its officers or agencies, place an "X" in this box.

Federal question. (3) This refers to suits under 28 U.S.C. 1331, where jurisdiction arises under the Constitution of the United States, an amendment to the Constitution, an act of Congress or a treaty of the United States. In cases where the U.S. is a party, the U.S. plaintiff or defendant code takes precedence, and box 1 or 2 should be marked.

Diversity of citizenship. (4) This refers to suits under 28 U.S.C. 1332, where parties are citizens of different states. When Box 4 is checked, the citizenship of the different parties must be checked. (See Section III below; federal question actions take precedence over diversity cases.)

**III.**     **Residence (citizenship) of Principal Parties.** This section of the JS 44 is to be completed if diversity of citizenship was indicated above. Mark this section for each principal party.

**IV.**     **Nature of Suit.** Place an "X" in the appropriate box. If the nature of suit cannot be determined, be sure the cause of action, in Section VI below, is sufficient to enable the deputy clerk or the statistical clerks in the Administrative Office to determine the nature of suit. If the cause fits more than one nature of suit, select the most definitive.

**V.**     **Origin.** Place an "X" in one of the seven boxes.

Original Proceedings. (1) Cases which originate in the United States district courts.

Removed from State Court. (2) Proceedings initiated in state courts may be removed to the district courts under Title 28 U.S.C., Section 1441. When the petition for removal is granted, check this box.

Remanded from Appellate Court. (3) Check this box for cases remanded to the district court for further action. Use the date of remand as the filing date.

Reinstated or Reopened. (4) Check this box for cases reinstated or reopened in the district court. Use the reopening date as the filing date.

Transferred from Another District. (5) For cases transferred under Title 28 U.S.C. Section 1404(a). Do not use this for within district transfers or multidistrict litigation transfers.

Multidistrict Litigation. (6) Check this box when a multidistrict case is transferred into the district under authority of Title 28 U.S.C. Section 1407. When this box is checked, do not check (5) above.

Appeal to District Judge from Magistrate Judgment. (7) Check this box for an appeal from a magistrate judge's decision.

**VI.**     **Cause of Action.** Report the civil statute directly related to the cause of action and give a brief description of the cause. **Do not cite jurisdictional statutes unless diversity.**     Example:     U.S. Civil Statute: <u>47 USC 553</u>
    Brief Description: <u>Unauthorized reception of cable service</u>

**VII.**     **Requested in Complaint.** Class Action. Place an "X" in this box if you are filing a class action under Rule 23, F.R.Cv.P.

Demand. In this space enter the dollar amount (in thousands of dollars) being demanded or indicate other demand such as a preliminary injunction.

Jury Demand. Check the appropriate box to indicate whether or not a jury is being demanded.

**VIII.**     **Related Cases.** This section of the JS 44 is used to reference related pending cases if any. If there are related pending cases, insert the docket numbers and the corresponding judge names for such cases. Provide a brief explanation of why the cases are related.

**Date and Attorney Signature.** Date and sign the civil cover sheet.

AO 440 (Rev. 12/09)  Summons in a Civil Action

# UNITED STATES DISTRICT COURT
for the

District of New Jersey

| | |
|---|---|
| Angela Posey, individually and on behalf of all others similarly situated, | ) |
| _____ | ) |
| *Plaintiff* | ) |
| v. | ) Civil Action No. |
| Building Materials Corporation of America d/b/a GAF Materials Corporation | ) |
| _____ | ) |
| *Defendant* | ) |

## SUMMONS IN A CIVIL ACTION

To: *(Defendant's name and address)*  Building Materials Corporation of America d/b/a GAF Materials Corporation
1361 Alps Road
Wayne, New Jersey 07470
973-628-3000

A lawsuit has been filed against you.

Within 21 days after service of this summons on you (not counting the day you received it) — or 60 days if you are the United States or a United States agency, or an officer or employee of the United States described in Fed. R. Civ. P. 12 (a)(2) or (3) — you must serve on the plaintiff an answer to the attached complaint or a motion under Rule 12 of the Federal Rules of Civil Procedure.  The answer or motion must be served on the plaintiff or plaintiff's attorney, whose name and address are:   Patrick Fanning Madden
Berger & Montague, P.C.
1622 Locust Street
Philadelphia, PA 19103

If you fail to respond, judgment by default will be entered against you for the relief demanded in the complaint. You also must file your answer or motion with the court.

*CLERK OF COURT*

Date: _____            _____
                                                    *Signature of Clerk or Deputy Clerk*

Civil Action No.

## PROOF OF SERVICE
### *(This section should not be filed with the court unless required by Fed. R. Civ. P. 4 (l))*

This summons for *(name of individual and title, if any)*   Building Materials Corporation of America d/b/a GAF

was received by me on *(date)*                              .

❒  I personally served the summons on the individual at *(place)*

_____ on *(date)* _____ ; or

❒  I left the summons at the individual's residence or usual place of abode with *(name)* _____

_____ , a person of suitable age and discretion who resides there,

on *(date)* _____ , and mailed a copy to the individual's last known address; or

❒  I served the summons on *(name of individual)* _____ , who is

designated by law to accept service of process on behalf of *(name of organization)* _____

_____ on *(date)* _____ ; or

❒  I returned the summons unexecuted because _____ ; or

❒  Other *(specify):*

.

My fees are $ _____ for travel and $ _____ for services, for a total of $   0.00   .

I declare under penalty of perjury that this information is true.

Date: _____

_____
*Server's signature*

_____
*Printed name and title*

_____
*Server's address*

Additional information regarding attempted service, etc:

Lawrence Deutsch
Shanon J. Carson*
Patrick Fanning Madden
BERGER & MONTAGUE, P.C.
1622 Locust Street
Philadelphia, PA 19103
Tel: (215) 875-4656
Fax: (215) 875-4604
*Attorneys for Plaintiff*
*Pro hac vice application pending*

### IN THE UNITED STATES DISTRICT COURT
### FOR THE DISTRICT OF NEW JERSEY

| | |
|---|---|
| ANGELA POSEY, individually and on behalf of all others similarly situated, | CIVIL ACTION NO. _____ |
| Plaintiff, | CLASS ACTION COMPLAINT |
| vs. | |
| BUILDING MATERIALS CORPORATION OF AMERICA, d/b/a GAF MATERIALS CORPORATION, | |
| Defendant. | |

Plaintiff Angela Posey ("Plaintiff"), individually and on behalf of all others similarly situated, through her undersigned attorneys, files this class action complaint against Defendant Building Materials Corporation of America d/b/a GAF Materials Corporation ("GAF"), and alleges as follows, based upon personal knowledge as to herself and her own acts, and as to all other matters upon information and belief.

### NATURE OF THE ACTION

1.    Plaintiff owns a home in Lugoff, South Carolina that has a roof shingled with Timberline shingles manufactured by GAF.

2.       GAF Timberline shingles are asphalt shingles that use a fiberglass material as their base.

3.       In order to be used on buildings and homes in the United States, shingles must be approved for use by state and local building codes.  Absent such approval, state and local codes prohibit shingles from being installed on homes and other structures.

4.       This case seeks redress for GAF's sale of shingles that failed to meet American Society for Testing and Materials ("ASTM") standards for fiberglass shingles but were nonetheless listed and marked by GAF as being compliant with ASTM standards.

5.       Because of raw material deficiencies and/or improper design and manufacturing, the GAF Timberline shingles on Plaintiff's home did not meet the performance requirements of ASTM D3462 at the time of sale and installation of those shingles at Plaintiff's home.  The shingles have continued to degrade beyond what is anticipated or expected since the time of installation.

6.       These product defects cause GAF fiberglass shingles, like those used on Plaintiff's home, to prematurely crack and fail well before the end of their warranted life.

7.       GAF's management personnel have known for many years that defects in GAF's fiberglass shingles cause the shingles to prematurely crack and fail.  GAF, however, concealed this and failed to inform homeowners, contractors and consumers that it had been selling shingles that did not meet ASTM D3462 and that continue to degrade beyond what is expected in the industry or by building owners.

8.       GAF has long known that its Timberline shingles are prone to crack and has assembled teams to investigate the cause of the cracking.  GAF ultimately concluded that defective raw materials caused the cracking, premature failure and non-compliance with ASTM

requirements in shingles made at several of its manufacturing facilities, including its facilities in Minneapolis, Minnesota; Baltimore, Maryland; Millis, Massachusetts; and Fontana, California. GAF was also aware that shingles made at its Mobile, Alabama plant had cracking issues and were failing at an unacceptable rate.

9.     GAF's shingles are plagued by design and manufacturing problems that result in cracking and other problems that make the shingles defective.  These defects make it inevitable that the shingles will degrade and fail before the end of their warranted or useful life and will cause property damage to the owners of buildings with such shingles.

10.     Ultimately finding the raw materials it had been using in Timberline shingles to be deficient, GAF changed its manufacturing specifications for newly manufactured shingles but did nothing to instruct or warn consumers who had already purchased shingles with the inadequate raw materials.

**THE PARTIES**

11.     Plaintiff owns a home in Lugoff, South Carolina on which GAF Timberline shingles were installed.  At all relevant times, Plaintiff has been a resident and citizen of South Carolina.

12.     GAF is in the business, among other things, of designing, advertising, warranting, manufacturing, distributing, and selling roofing products.  Among the products GAF manufactures, markets and sells are shingles used on homes and other buildings.

13.     GAF is a Delaware corporation that maintains its principal place of business and corporate headquarters in Wayne, New Jersey.  GAF's marketing, sales, advertising, and warranty operations for Timberline shingles are all located in New Jersey.

3

14.     GAF operates multiple shingle manufacturing and distribution facilities across the United States.

15.     GAF claims to be North America's largest manufacturer of roofing products like fiberglass shingles.

## JURISDICTION AND VENUE

16.     This Court has jurisdiction over this action pursuant to Rule 23 of the Federal Rules of Civil Procedure and under the Class Action Fairness Act, 28 U.S.C. § 1332(d), as the amount in controversy exceeds $5,000,000 and some of the class members are citizens of different states than Defendant GAF.

17.     This Court has supplemental jurisdiction over Plaintiff's state law claims pursuant to 28 U.S.C. § 1367.

18.     Venue is proper in this District pursuant to 28 U.S.C. §§ 1391(b) and (c), because GAF has its corporate headquarters and principal place of business in this District, can be found and conducts business in this District, and because the acts and omissions giving rise to this action occurred in this District.

## FACTUAL ALLEGATIONS

### A.  ASTM D3462

19.     Purchasers and users of shingles require that manufacturers of shingles certify that the shingles comply with standards promulgated by relevant certification and standards organizations.

20.     ASTM International is a standard setting organization that establishes and maintains industry standards for many different products.

21.     ASTM International establishes engineering and product testing standards. Shingles are among the products for which ASTM has developed standards and product testing programs.

22.     ASTM D3462 – Standard Specification for Asphalt Shingles Made from Glass Felt and Surfaced with Mineral Granules -- is recognized by the roofing industry as the critical standard for fiberglass-reinforced asphalt shingles.

23.     Model building codes in the United States reference ASTM D3462 as the minimum requirement for product performance for fiberglass-reinforced asphalt shingles.  As a result, shingles that do not comply with ASTM D3462 cannot be legally installed on homes and buildings in the United States.

24.     One requirement of ASTM D3462 is that the fiberglass shingles pass certain tear strength tests that measure the shingles' ability to withstand tearing and cracking.

25.     If manufacturers of fiberglass shingles did not warrant their compliance with the applicable standards – including ASTM D3462 -- consumers or the consumers' agents would not purchase those shingles and would instead purchase competitors' shingles that did in fact meet the applicable standards.

26.     Fiberglass shingles that do not meet ASTM D3462, do not meet industry standards, are not marketable, have no market value, and cannot be sold to consumers at any price.

**B. Prior Cracking Problems and Class Action Settlement for GAF Timberline Shingles**

27.     Because of problems with cracking in its shingles, GAF was previously named as a defendant in several lawsuits.  Included in those suits was a class action titled *Coleman, et al. v. GAF Building Materials Corp.*, CV-96-0954 (Alabama Circuit Court, Mobile County).

28.     GAF ultimately settled the *Coleman* lawsuit by paying more than $13 million to resolve claims involving cracking shingles.  Only shingles manufactured before December 31, 1997, however, were included in that class action settlement.

29.     Plaintiff's GAF Timberline shingles were manufactured after December 31, 1997, and therefore were not included in the *Coleman* class action settlement.

### C. Cracking Studies and Their Concealment from Consumers

30.     By the late 1990s, GAF had received reports of problems with cracking in its fiberglass shingles, including the Timberline shingles, the type of shingles used on Plaintiff's home.  GAF conducted a number of internal analyses of the cracking problems and issued reports.  For example, GAF concluded that cracking claims for GAF laminated fiberglass shingles increased 43% from 2001 to 2002 alone.

31.     By 2002, GAF had spent several million dollars responding to claims brought by consumers for cracking shingles.  The GAF Senior Vice President of Operations for all GAF manufacturing plants at that time, Ken Walton, directed GAF employees to further investigate the cracking problems.

32.     By 2003, the cracking of shingles manufactured in GAF's Minneapolis facility was the "fastest growing problem" facing GAF.  In response to this problem, GAF created a team of personnel to study and investigate why its shingles were cracking well before the end of their warranted or useful life.

### D. Internal GAF Testing Proves its Shingles Will Crack and Fail Prematurely

33.     GAF's former Director of Central Quality Assurance, Guy Gimbson, has admitted in sworn testimony that he was asked by his supervisor, Ken Walton, to produce a

Central Quality Assurance ("CQA") report relating to cracking problems being reported with GAF shingles.

34.    By the time Ken Walton requested this CQA report on shingle cracking, GAF had already concluded that the shingle cracking problem spanned across manufacturing facilities and geographic locations.

35.    In response to the growing shingle cracking problems, GAF and its employees, led by Guy Gimbson, held a number of technical meetings to investigate and analyze these problems.

36.    In 2002-2003, Guy Gimbson issued a CQA report that outlined the findings of the cracking team's efforts and the study they performed.

37.    Among the problems GAF identified were "cold weather cracking" failures of shingles manufactured by its Minneapolis facility.

38.    In August 2003, Guy Gimbson authored a CQA report titled "Minneapolis Shingle Cracking" and outlined testing done by GAF that proved that its laminated fiberglass shingles, including its Timberline shingles, cracked at low temperatures.

39.    At about the same time, the GAF quality assurance personnel also identified cracking problems in shingles manufactured in its Mobile, Alabama and Dallas, Texas facilities. Internal GAF documents describe the laminate shingles as having a "high failure rate" in all territories and climates in which they were sold.

40.    In other internal documents including documents titled "Problem Analysis," the "State the Problem" section of the internal GAF document stated: "Shingles made in Minneapolis are cracking during warranty preview."  The time frame given in that document for the problem being analyzed was "Product manufactured since the 1980s."

41.     Internal GAF documents also analyze shingle cracking and failure problems related to shingles manufactured in its facilities in Baltimore, Maryland; Millis, Massachusetts; and Fontana, California.

42.     GAF also investigated cracking problems reported in North Carolina related to shingles manufactured in its Mobile, Alabama facility and even assembled a "Mobile cracking team" to assess the problem.

43.     Ultimately, GAF determined the cause of the cracking problems in the Minneapolis, Baltimore, Millis and Fontana facilities.  GAF found that defects or deficiencies in the raw materials used in Timberline and other laminate fiberglass shingles caused those shingles to prematurely crack and fail.

44.     GAF corporate representatives, including Guy Gimbson and Ken Walton, knew about the findings and conclusions of these studies.

45.     In response to its internal investigation, analysis, and conclusion that improper raw materials had caused the cracking failures, GAF changed its raw materials specifications for its Timberline fiberglass shingles.

46.     Even after concluding internally that it had been manufacturing shingles with defective raw materials, GAF concealed – from consumers, contractors, and state and local code officials – the fact that it had manufactured Timberline shingles that failed to comply with ASTM D3462 and were cracking when used as intended.

47.     Although it changed its own materials specifications because it knew that its old specifications produced shingles that could not meet ASTM D3462 requirements and cracked when used as intended, GAF concealed from contractors, distributors, regulatory authorities, and consumers that it had long been selling shingles that were of inferior quality, could not meet

ASTM D3462's performance requirements, and would crack or otherwise be damaged and fail when used as intended.

48. Instead of acting honestly and responsibly to minimize harm to its customers and consumers, GAF chose to continue its scheme to conceal these defects and simply changed its internal raw materials specifications without advising consumers of the problems associated with Timberline shingles.

49. GAF employees involved in this scheme included, but were not limited to, Guy Gimbson, Walt Workman and Ken Walton.

50. Testing done on the shingles taken from a putative class member's home, including new and unused shingles, showed that the GAF shingles failed to meet the tear strength testing requirements of ASTM D3462.

51. The failure to comply with ASTM D3462 requires that all homes or properties with GAF Timberline shingles manufactured after December 31, 1997 be re-roofed with shingles that comply with ASTM D3462.

**E. False Advertising and Misbranding of GAF Timberline Shingles**

52. GAF's shingles are not ordinary building products. GAF performs extensive consumer marketing and advertising for them, selling them with a manufacturer's warranty and often attempting to maintain quality control to the point of training and certifying contractors to install these shingles.

53. GAF performs all of the design, engineering, testing and manufacturing for its shingles and has complete control over them.

54.     GAF has been marketing and advertising its Timberline shingles as being "the heaviest and longest-lasting fiberglass asphalt shingle in the Timberline series" and stating that their design "promotes longest life and extra durability."  (www.gaf.com; 4/27/99).

55.     GAF has been marketing and advertising its Timberline shingles as possessing "superior strength and improved weathering in harsh conditions" because of their "Micro Weave Core" fiberglass felt.  (www.gaf.com; 4/27/99).

56.     GAF also markets, advertises, and states on its Timberline packaging that the shingles meet ASTM D3462.

57.     Compliance with ASTM D3462 is a material requirement and term for the purchase of fiberglass shingles.

58.     In virtually every piece of marketing materials associated with GAF Timberline shingles, GAF falsely claimed that the shingles complied with ASTM D3462.  For the reasons stated herein, these statements were false and misleading because the shingles actually produced and sold to consumers did not meet ASTM D3462 requirements.

59.     GAF made these false statements every time it sold GAF Timberline shingles in packages that were stamped with ASTM D3462 certifications, which falsely claimed that the shingles complied with that standard.

60.     Because the GAF Timberline shingles did not meet ASTM D3462 requirements, GAF falsely represented and advertised that those shingles complied with the standard.

61.     GAF's marketing and sales materials also falsely represented the certifications and characteristics of the Timberline shingles.  For example, in sales brochures GAF falsely claimed that the shingles met ASTM D3462 requirements.

62.     In marketing and sales brochures, GAF shingles are falsely represented as meeting ASTM D3462 requirements and being high quality shingles that would last for decades without problems.

63.     GAF continued to publicly disseminate these brochures, which contain the false and misleading information described herein, until just recently.  Similar brochures continue to be listed at GAF's website, www.gaf.com.

64.     GAF also falsely claimed on its website that: "Because of our state-of-the-art manufacturing process, the odds of you having a problem with a new GAF roof is about one in a thousand." This statement was false.

65.     Each of the false statements and misrepresentations made in the preceding paragraphs were repeatedly restated by GAF's sales personnel and their manufacturer's representatives, in the course of every sale of GAF shingles.  GAF, however, knew at the time these statements were provided to consumers, suppliers, and contractors that the statements were false and unsupported.

66.     At all times and in all marketing and advertising communications with consumers, suppliers and contractors, GAF and its representatives knowingly misrepresented that GAF Timberline shingles were fit and suitable for use in new home construction, remodels and repairs when in fact the shingles did not meet ASTM D3462 requirements and therefore did not meet many applicable building code requirements.

67.     At all times and in all marketing and advertising communications with consumers, suppliers and contractors, GAF and its representatives knowingly misled consumers into believing that GAF shingles complied with ASTM D3462 and were therefore legal to use on roofing projects.

68.     Whether the shingles complied with ASTM D3462 was a material fact for the consumers and purchasers of GAF Timberline shingles.  GAF through misrepresentations, knowing omissions, and other unfair business practices – misled consumers and otherwise concealed the true nature of the shingles with the intent that consumers and purchasers rely on those representations and omissions.

69.     In addition to the representations made in their advertising materials and on their websites, the Timberline shingles packaging sold by GAF had stamps on it which indicated that the shingles conformed to ASTM D3462.  When a product or packaging is marked with the ASTM designation D3462, the product is represented to have been manufactured, tested, inspected and sampled in accordance with that standard and has been found to meet the standard's requirements.

70.     When GAF and its representatives made each of the affirmative misrepresentations outlined herein, GAF knew or should have known that the representations were false and/or misleading.  When marking its shingles packaging with an ASTM D3462 designation, GAF and its representatives intended that consumers, purchasers of these shingles, roofing contractors, and local code officials would rely on the false and misleading statements.  Plaintiff received and relied on such representations.

71.     GAF's shingles, however, did not comply with ASTM D3462's tear strength requirements and therefore could not comply with ASTM D3462.  GAF knew or should have known that its advertising statements about compliance with ASTM D3462 were false.  GAF knew or should have known that its certification of compliance with ASTM D3462, asserted by designations on every shingle package were false.

72.     GAF was obligated to disclose the defects, use of substandard materials, and non-compliance with industry standards because such disclosure was necessary to qualify affirmative representations made about GAF Timberline shingles and to make such representations non-misleading.  The failure to inform consumers about these problems rendered GAF's affirmative representations about the shingles materially misleading.  Such disclosure was also necessary because GAF was uniquely in possession of facts it did not disclose, knew that such facts were not available to Plaintiff and the class members, and knew that such facts that had been knowingly omitted would be material to any prospective purchaser of the Timberline shingles.

73.     At all times and in all marketing and advertising communications with consumers, suppliers and contractors, GAF and its representatives knowingly misled consumers into believing that Timberline shingles complied with ASTM standards.  Plaintiff and other consumers relied on these misrepresentations because the shingles could not have been used in the United States without compliance with those standards.  GAF, therefore, passed off its shingles as being of a particular quality, standard or grade that they were in fact not.

74.     Plaintiff, and other consumers believed, based on GAF's representations, that they were purchasing shingles that complied with ASTM D3462 and that complied with state and local building codes.  Plaintiff and other consumers would not have purchased GAF shingles or properties that used those shingles if they had known the truth about the shingles.

75.     Plaintiff and other consumers believed, based on GAF's representations, that GAF used proper materials for Timberline shingles and would not have bought the shingles if GAF had disclosed the truth about its "cracking problems" and "cracking teams," or the fact that it had concluded that there were materials problems with these shingles.  No reasonable

consumer or contractor would have bought these shingles if GAF had not concealed this important information.

**F. Plaintiff's Circumstances**

76.     Plaintiff was familiar with GAF's representations about the quality of their shingles, and obtained these shingles because she believed that they were the best shingles on the market and that GAF was the best shingle manufacturer.

77.     Plaintiff purchased a set of GAF shingles in or around June 1999 which proved defective, and made a warranty claim.

78.     The packaging of the shingles delivered to and used on Plaintiff's home was stamped with an ASTM D3462 designation, implying that the shingles complied with ASTM D3462.

79.     Plaintiff reasonably believed that the GAF Timberline shingles used on her home met all listing and code requirements and expressly relied on the ASTM D3462 designations placed on the shingle packaging by GAF.

80.     Plaintiff, when purchasing GAF Timberline shingles, reasonably expected that the shingles complied with all listing and code requirements and Plaintiff relied on the accuracy of the designations affixed to the shingles and their packaging.

81.     Before deciding to install GAF Timberline shingles at her home, Plaintiff was told that GAF provided a 25-year warranty for the shingles.

82.     Plaintiff reasonably relied on GAF's representations about compliance with ASTM standards, the quality of their shingles and the shingles' code compliance when deciding to install the GAF shingles with the express warranty.  Plaintiff also believed that a shingle sold

under a 25-year warranty would be robust enough to provide roofing protection for that length of time.

83.    Because of GAF's conduct outlined herein, Plaintiff and members of the class did not know, and could not have known, that their shingles did not comply with ASTM D3462 at the time of sale and installation.  Moreover, GAF's conduct has prevented class members from discovering that their shingles did not comply with ASTM D3462 requirements and that remediation was necessary to rectify the non-compliance and its concomitant risks and problems.

84.    GAF at no time disclosed to Plaintiff the cracking problems their shingles had, and never disclosed the findings of the cracking teams.

85.    Because of GAF's conduct outlined herein, Plaintiff and members of the class did not know, and could not have known, that their shingles were made from substandard and defective materials, had a cracking problem, and were the subject of cracking team investigations.  Moreover, GAF's conduct has prevented class members from discovering that their shingles were defective and that remediation was necessary to rectify the non-compliance and its concomitant risks and problems.

86.    Plaintiff did not, and could not have discovered the defects in the shingles because no reasonable consumer would have the ability to independently discover these concealed facts.

87.    Plaintiff, having been assured that, as a long-lasting, heavy and durable product, GAF shingles would last through the life of the warranty, did not know of the problems with the shingles, until she experienced cracking of her shingles within the last two years.

88.    The cracking process of these shingles is present and underway even before the problems are noticed by a consumer or contractor.

89.     Until her cracking began, Plaintiff had no reason to know that GAF had placed in the stream of commerce defective and misbranded shingles.

90.     Shortly after discovery, Plaintiff contacted GAF, which continued to conceal the true nature of the defect in the shingles used on Plaintiff's home.

91.     GAF's conduct outlined herein was intended to and did in fact fraudulently conceal its behavior and, as a result, tolled the statute of limitations for Plaintiff and members of the class.  By affirmatively representing that their shingles met the ASTM D3462 standard, were of superior quality, were the heaviest and longest-lasting shingles of their kind, could withstand harsh conditions and would last for the life of the warranty, GAF engaged in trickery and artifice to prevent Plaintiff from discovering the defects in Timberline shingles.  The affirmative acts in which GAF engaged to conceal facts about the true quality of the shingles, through advertising, labeling and marketing, were calculated to hinder discovery by ordinary diligence.  GAF's affirmative misrepresentations involve acts of low moral turpitude, which could only be undertaken by a corporation intending to mislead consumers into purchasing a defective product.

92.     Plaintiff, like all class members, has a real and present injury in that she owns a home with substandard shingles that do not comply with ASTM D3462.

93.     Plaintiff's shingles have caused damage to Plaintiff's home, including, without limitation, the cost to replace the shingles to become code compliant and to avoid further damage to other parts of the structure caused by the defective and cracking shingles.  Likewise, Plaintiff and class members have incurred or are reasonably certain to incur, the cost of repairing the damage to their other property that was caused by GAF's sale of defective shingles.

94.     Plaintiff and the proposed class members suffered damage to property other than the GAF shingles.  Plaintiff and class members suffered general and specific compensatory and

contractual damages including, without limitation consequential, incidental, loss of use, diminution of value, attorneys' fees, costs and disbursements.

## CLASS ALLEGATIONS

95.     Plaintiff brings this class action on behalf of herself and all others similarly situated, for all claims alleged herein, pursuant to Rule 23 of the Federal Rules of Civil Procedure.  The first proposed class is defined as:

> All persons and entities that own or owned a structure in the United States that contains or contained Timberline shingles manufactured from December 31, 1997 to the present in GAF Materials Corporation's facilities in Minneapolis, Minnesota; Mobile, Alabama; Baltimore, Maryland; Millis, Massachusetts; and Fontana, California.

96.     Alternatively, Plaintiff brings this class action on behalf of herself and all others similarly situated, for all claims alleged herein, pursuant to Rule 23 of the Federal Rules of Civil Procedure, for a second proposed class or subclass defined as:

> All persons and entities that own or owned a structure, within certain of the United States, that contains or contained Timberline shingles manufactured from December 31, 1997 to the present in GAF Materials Corporation's facilities in Minneapolis, Minnesota; Mobile, Alabama; Baltimore, Maryland; Millis, Massachusetts; and Fontana, California.

97.     Alternatively, Plaintiff brings this class action on behalf of herself and all others similarly situated, for all claims alleged herein, pursuant to Rule 23 of the Federal Rules of Civil Procedure, for a third proposed class or subclass defined as:

> All persons and entities that own or owned a structure, within the State of South Carolina, that contains or contained Timberline shingles manufactured from December 31, 1997 to the present in GAF Materials Corporation's facilities in Minneapolis, Minnesota; Mobile, Alabama; Baltimore, Maryland; Millis, Massachusetts; and Fontana, California.

98.     Plaintiff specifically excludes GAF and its related entities from the putative class. These include all subsidiaries or affiliates of GAF; any entity in which GAF has a controlling

17

interest; and any and all of GAF's employees, affiliates, legal representatives, heirs, successors or assignees.

99.     Plaintiff also excludes from the putative class any person or entity that has previously commenced and concluded a lawsuit against GAF arising out of the subject matter of this lawsuit.

100.    Plaintiff reserves the right to modify or amend the class definitions, as appropriate as this case proceeds.

101.    This class action satisfies numerosity, commonality, typicality, adequacy, and superiority requirements for maintaining a class.

102.    Certification of Plaintiff's claims for class wide treatment is appropriate because Plaintiff can prove the elements of her claims using common, class-wide evidence.  Such evidence includes GAF's own internal documents which confirmed that it had used substandard materials, which it subsequently abandoned.

103.    **Numerosity.**  Pursuant to Rule 23(a)(1) of the Federal Rules of Civil Procedure, the class "is so numerous that joinder of all members is impracticable."  The number of members of the class is believed to be at least thousands of individuals and/or entities that own properties with GAF Timberline and other fiberglass shingles.

104.    Joinder of the persons and entities whose properties use GAF Timberline and other fiberglass shingles is impractical and not feasible.

105.    **Commonality.**  Pursuant to Rule 23(a)(2) of the Federal Rules of Civil Procedure, the class shares "questions of law or fact" that predominate and individualized issues. The common questions include, without limitation:

- Were GAF's shingles defectively designed for their intended application, and if so, what is the nature of the design defect?

18

- Were GAF's shingles defectively manufactured for their intended application, and if so, what is the nature of the manufacturing defect?

- Did GAF fail to instruct or to warn consumers its shingles failed to meet ASTM D3462 requirements at the time of sale and installation?

- Did GAF adequately instruct or warn consumers about the cracking propensities of its shingles?

- Did GAF make fraudulent, false, deceptive and/or misleading statements in connection with the sale of its shingles in its packaging and product literature?

- Did GAF omit material information when it sold its fiberglass shingles?

- Did GAF utilize misrepresentations, knowing omissions, or other sharp business practices when it advertised, marketed, and sold its fiberglass shingles?

- Did GAF exercise reasonable care in the design, manufacture and testing of its fiberglass shingles?

- Did GAF deliberately sell or allow fiberglass shingles to be distributed after it knew the shingles could not meet ASTM D3462?

- What categories of damages are recoverable for owners of structures with GAF fiberglass shingles, e.g., replacement, consequential, incidental or other damages?

- Is Plaintiff entitled to relief under GAF's express or implied warranties?

- Is GAF obligated to provide a post-sale warning or instruction to the owners of buildings that use its fiberglass shingles?

- Can the class obtain a declaration concerning the types and categories of damages and remedies available to class members?

106.    **Typicality.**  Pursuant to Rule 23(a)(3) of the Federal Rules of Civil Procedure, the claims of the class representative "are typical of the claims … of the class."  Plaintiff and all members of the class who own GAF's defective shingles have suffered damages as a result of GAF's wrongful acts and misconduct.  Pursuant to corporate directives, GAF engaged in a similar pattern of misconduct towards both Plaintiff and all other class members.

107.    **Adequacy**.  Pursuant to Rule 23(a)(4) of the Federal Rules of Civil Procedure, Plaintiff "will fairly and adequately protect the interests of the class."  Plaintiff has no adverse

interests to the class members. Plaintiff was sold or installed defective and mislabeled GAF shingles. Plaintiff has retained lawyers who have substantial resources, experience and success in the prosecution and defense of class action, mass tort and complex litigation, and the insurance coverage and settlement issues attendant to the same.

108. **Superiority.** Pursuant to Rule 23(b)(3) of the Federal Rules of Civil Procedure, a class action is a superior method of resolving this action for the following reasons:

    a.    A class action in this instance conserves the resources of the class, GAF and the Court. The damages of most class members are not, in isolation, significant enough to hire an attorney on a contingency basis, and the burden and expense of hiring an attorney on a per diem basis for Plaintiff and most class members, makes it difficult if not impossible for the class members to seek redress. The costs of retaining an expert to issue a report, be deposed, and to appear and testify at trial are substantially more costly than the value of the average claim is worth absent a fess shifting statute;

    b.    On information and belief, no Attorney General of any state has brought an enforcement action against GAF to remedy the claims asserted herein;

    c.    There are and likely will be other cases pending against GAF. Serial adjudications in numerous venues are not efficient, timely, or proper. Judicial resources throughout New Jersey and the United States will be unnecessarily depleted by resolution of individual claims;

    d.    Individualized judgments and rulings could result in inconsistent relief for similarly situated plaintiffs. Individualized lawsuits could also establish incompatible standards of conduct for GAF in creating, marketing, sale and post-sale conduct in connection with its fiberglass shingles.

## COUNT I
### (Breach of Express Warranties)

109. Plaintiff re-alleges the foregoing paragraphs as though fully set forth herein.

110. GAF made certain express warranties to distributors, contractors, and consumers, including Plaintiff, about the shingles it would provide.

111. The express warranties provided by GAF included warranties that GAF Timberline shingles were fit and suitable for use on homes and other structures, would be

durable, resistant to harsh conditions, non-defective and merchantable, and complied with ASTM D3462. Such warranties were made in the product literature described in this Complaint and on the packaging of the shingles.

112. Compliance of these shingles with ASTM D3462 was a separate and distinct warranty that was material and uniformly relied upon by all members of the class and their representatives.

113. The express warranties provided by GAF also included warranties that GAF Timberline shingles were warranted and would perform adequately during the warranty period. GAF used the same or substantially the same warranty terms for all Timberline shingles sold during the time at issue in this case.

114. The warranties described above became part of the basis of the bargain, inducing Plaintiff to choose GAF's shingles and serving as part of the consideration accepted by Plaintiff.

115. Shingle distributors, contractors, local officials, Plaintiff and the class members relied upon GAF's express warranties.

116. GAF breached its express warranties by manufacturing and selling shingles that were defective, did not meet ASTM D3462 requirements, were not durable and were not suitable for use on homes and other structures in the United States.

117. GAF also breached its express warranties by refusing to pay the full amount owed to Plaintiff and other members of the class under its warranty.

118. As a direct, proximate and foreseeable cause of GAF's breach of express warranties, Plaintiff and the class sustained damages in an amount to be determined at trial.

**COUNT II**
**(Breach of Implied Warranties)**

119. Plaintiff re-alleges the foregoing paragraphs as though fully set forth herein.

120. GAF made implied warranties to distributors, contractors, and consumers, including Plaintiff, that the shingles it provided were merchantable, namely that they pass without objection in the trade, are fit for the ordinary purposes for which they are used, are adequately labeled, and conform to the descriptions on their labels.

121. By selling shingles that were not fit for their use, but rather failed when applied to consumers' roofs, and that were unmerchantable, having defects such as cracking, curling and leaking, GAF breached its implied warranties.

122. GAF also breached its implied warranties by selling shingles which were mislabeled and did not conform to the labels with which they were sold, which labels erroneously claimed that the shingles met ASTM D3462 requirements.

123. As a direct, proximate and foreseeable cause of GAF's breach of implied warranties, Plaintiff and the class sustained damages in an amount to be determined at trial.

## COUNT III
### (Negligence)

124. Plaintiff re-alleges the foregoing paragraphs as though fully set forth herein.

125. GAF was negligent in that it failed to use reasonable care when it designed, tested, manufactured, marketed and sold Timberline shingles.

126. As the designer, tester, manufacturer, and/or seller of consumer products, GAF owed a duty to Plaintiff and the class members to provide a safe and quality product, and a duty to provide a product that was properly certified and labeled for use on homes and other structures. GAF breached those duties.

127. As a direct and proximate result of GAF's negligence, lack of care, and other wrongful acts, Plaintiff and the class sustained and will sustain damages.

128.     As a result of GAF's negligence, Plaintiff and the class have suffered actual damages in that they have purchased and installed in their homes and structures, shingles that are defective, unreasonably dangerous and unsuitable for their intended use.

129.     The degradation and failure of GAF's shingles causes damage to property other than the shingles themselves in use and during the removal and reinstallation process.

130.     As a result of GAF's negligence, Plaintiff and the class will suffer damages that include not only the full cost to replace their shingles, but also include, without limitation, damage to property other than the GAF shingles, consequential, and incidental damages.

131.     As a direct, proximate and foreseeable result of GAF's negligence, Plaintiff and the class have been damaged in an amount to be determined at trial.

### COUNT IV
### (Negligent Failure to Instruct or to Warn)

132.     Plaintiff re-alleges the foregoing paragraphs as though fully set forth herein.

133.     As the designer, tester, manufacturer, and seller of a consumer product, GAF had a duty to provide accurate labeling and written materials for that product.

134.     As the designer, tester, manufacturer, and seller of a consumer product, GAF had a duty to instruct or to warn of foreseeable dangers inherent in the proper use of its product and to properly label and package its product.

135.     GAF was aware that its Timberline shingles had a propensity to crack and did not comply with ASTM D3462 at the time of sale and installation and, as a result, should not and could not be used for their intended purpose.

136.     Despite the fact that GAF knew its Timberline shingles were defective and should not be used, GAF continued to sell the products to the public without correction and, in fact,

concealed from the public the fact that the shingles were defective, mislabeled, and not suitable for their intended use.

137.    Because the shingles related to the habitability of persons' homes and GAF knew that they were defective and likely to fail, GAF had a duty to consumers and to the public to disclose the defective nature of their shingles and not to conceal and suppress the defective nature of the product from Plaintiff and the class members.

138.    GAF, however, engaged in a scheme to cover up the true nature of the problems. This scheme included the concealment of GAF's "cracking teams" and its internal acknowledgement that it had been using inadequate materials for Timberline shingles. This scheme also included GAF's attempts to keep information about the defective nature of the shingles out of the public domain by failing to inform consumers, contractors, and code officials that its Timberline shingles did not meet ASTM standards.

139.    To this day, GAF continues this concealment and suppression by failing to inform the public about the unsuitability of the shingles for their intended use and their non-compliance with ASTM standards. As the manufacturer, seller and distributor of consumer products, GAF had a duty to provide such information.

140.    As a direct, proximate and foreseeable result of GAF's failure to instruct or to warn, Plaintiff and the class suffered damage.

141.    As a result of GAF's failure to instruct or to warn, Plaintiff and the class have suffered actual damages in that they have purchased and installed in homes and structures shingles that are defective, unreasonably dangerous and unsuitable for their intended use.

142.    As a result of GAF's failure to instruct or to warn, Plaintiff and the class will suffer damages that include not only the full cost to replace their shingles, but also include,

without limitation, damage to property other than the GAF shingles, consequential, and incidental damages.

143.    As a direct, proximate and foreseeable result of GAF's negligence, Plaintiff and the class members have been damaged in an amount to be determined at trial.

144.    GAF's wrongful conduct and misrepresentation of the true quality of its Timberline shingles, also includes, by way of example and not by limitation:

    a.    GAF's fraudulently claiming that Timberline shingles complied with ASTM D3462;

    b.    GAF's fraud and misrepresentation by omission, of information about the defective nature of Timberline shingles, the improper design of the products, and GAF's knowledge of those defects,

    c.    GAF's fraudulent, misleading, and deceptive statements and practices relating to the sale of Timberline shingles that were made from defective and substandard materials while GAF advertised and represented that the shingles would last 25 or more years, and

    d.    GAF's concealment of the true nature of its defective Timberline shingles.

## COUNT V
**(Violation of the New Jersey Consumer Fraud Act, N.J.S.A. §§ 56:8-1, *et seq.*)**

145.    Plaintiff re-alleges the foregoing paragraphs as though fully set forth herein.

146.    The New Jersey Consumer Fraud Act ("CFA") is a consumer protection statute designed to protect consumers from a wide variety of marketplace tactics and practices.  The CFA provides that that "[a]ny person who suffers any ascertainable loss . . . , as a result of the use or employment by another person of any method, act, or practice declared unlawful under this act, may bring an action . . . in any court of competent jurisdiction."  N.J.S.A. § 56:8-19.

147.    "Unlawful acts" under the CFA include:

The act, use or employment by any person of any unconscionable commercial practice, deception, fraud, false pretense, false promise, misrepresentation, or the knowing, concealment, suppression, or omission of any material fact with intent

that others rely upon such concealment, suppression, or omission, in connection with the sale or advertisement of any merchandise . . . or with the subsequent performance of such person . . . , whether or not any person has in fact been misled, deceived or damaged thereby, is declared to be an unlawful practice.

N.J.S.A. § 56:8-2.

148.    Plaintiff, Class members and Defendant all qualify as "persons" under the CFA. N.J.S.A. § 56:8-1(d).

149.    The shingles manufactured by GAF and purchased by Plaintiff and Class members qualify as "merchandise" under the CFA.  N.J.S.A. § 56:8-1(c).

150.    Defendant has engaged and continue to engage in conduct the CFA makes unlawful.

151.    GAF made the misrepresentation that its shingles had the qualities and characteristics listed in this Complaint, which are hereby incorporated here, including that they met ASTM D3462 requirements, that they would last 25 years, that they were of superior quality, that they were durable and that they were able to withstand a number of conditions.

152.    GAF also misrepresented that its shingles could be used for normal purposes without prematurely failing.

153.    GAF also made misrepresentations, by omission, of information about the defective nature of Timberline shingles, the improper manufacture of the products and GAF's knowledge of those defects.

154.    Defendant's conduct thus constitutes a violation of the CFA.  Plaintiffs and the Class have suffered an ascertainable loss in that they have purchased and installed in homes and structures shingles that are defective, not suitable for their intended use and not in compliance with ASTM D3462.  There is a causal nexus between GAF's actions and the damages suffered by the Plaintiff and the Class.

155.    Plaintiff and the class will suffer damages that include not only the full cost to replace their shingles, but also include, without limitation, property damage, consequential and incidental damages.

156.    As a direct, proximate and foreseeable result of GAF's unlawful acts under the CFA, Plaintiff and class members sustained damages in an amount to be determined at trial.

### COUNT VI
### (Violation of the South Carolina Unfair Trade Practices Act, S.C. Code § 39-5-10, *et seq.*)

157.    Plaintiff re-alleges the foregoing paragraphs as though fully set forth herein.

158.    The South Carolina Unfair Trade Practices Act ("UTPA"), S.C. Code § 39-5-10, *et seq.*, prohibits the use of "[u]nfair methods of competition and unfair or deceptive acts or practices in the conduct of any trade or commerce . . . ." S.C. Code § 39-5-20.

159.    Plaintiff and class members qualify as "persons" under the UTPA. S.C. Code. § 39-5-10(a).

160.    GAF's manufacturing, marketing and sale of the shingles purchased by Plaintiff and the Class qualifies as "trade" and/or "commerce" under the UTPA. S.C. Code § 39-5-10(b).

161.    Defendant has engaged and continue to engage in conduct that violates the UTPA.

162.    GAF made the misrepresentation that its shingles had the qualities and characteristics listed in this Complaint, which are hereby incorporated here, including that they met ASTM D3462 requirements, that they would last 25 years, that they were of superior quality, that they were durable and that they were able to withstand a number of conditions.

163.    GAF also misrepresented that its shingles could be used for normal purposes without prematurely failing.

164.     GAF also made misrepresentations, by omission, of information about the defective nature of Timberline shingles, the improper manufacture of the shingles, and GAF's knowledge of those defects.

165.     Defendant's conduct thus constitutes a violation of the UTPA. Plaintiff and class members have suffered actual damages and an ascertainable loss caused by GAF's misrepresentations, in that they have purchased and installed in homes and structures shingles that are defective, not suitable for their intended use, and not in compliance with ASTM D3462. There is a causal nexus between GAF's actions and the loss suffered by the Plaintiff and the Class.

166.     Plaintiff and class will suffer damages that include not only the full cost to replace their shingles, but also include, without limitation, property damage, consequential and incidental damages.

167.     As a direct, proximate and foreseeable result of GAF's violation of the South Carolina Unfair Trade Practices Act, Plaintiff and class members sustained damages in an amount to be determined at trial.

## COUNT VII
### (Declaratory and Injunctive Relief)

168.     Plaintiff re-alleges the foregoing paragraphs as though fully set forth herein.

169.     Pursuant to Rule 23(b)(2) of the Federal Rules of Civil Procedure, the equitable power of this Court, and any applicable statute or rule providing for declaratory and/or injunctive relief, Plaintiff and the class members seek a declaratory judgment as follows:

      a.      To the extent GAF alleges that any pretend limitations, restrictions or disclaimers of express warranty preclude full recovery of damages, the warranties fail of their essential purpose because the remaining remedies provided therein are inadequate and deprive the class of the benefit of the bargain of their purchases, because GAF at the time of sale and thereafter

concealed and suppressed that the Timberline shingles were defective, and because the provisions are otherwise unconscionable;

b.    To the extent GAF alleges that any pretend limitations, restrictions or disclaimers of express warranty preclude full recovery of damages, the same is unconscionable because the warranties do not provide adequate remedies because the defect in the shingles is latent and because the class members lacked sufficient bargaining power;

c.    That GAF's attempted disclaimers of warranties or limitations of remedies are ineffective because GAF failed to deliver them to the consumer or their representatives at the time of sale of the Timberline shingles;

d.    That GAF be forced to advise prior warranty claimants that its attempts to condition express warranty payments on demands made to consumers that were never part of an express warranty were unlawful;

e.    That the Timberline shingles are unsuitable for their intended use because they do not comply with ASTM D3462;

f.    That the Timberline shingles need to be replaced because they do not comply with ASTM D3462; and

g.    To the extent GAF has had an adverse adjudication against it arising from the subject matter of this Complaint, that the class may use offensive collateral estoppel against GAF for the rulings and determinations therein.

## COUNT VIII
### (Fraudulent Concealment / Equitable Tolling)

170.    Plaintiff re-alleges the foregoing paragraphs as though fully set forth herein.

171.    The substandard and non-conforming nature of GAF Timberline shingles is not perceptible to a reasonable consumer.

172.    The cracking process of these shingles is underway before problems are noticed by a customer.

173.    GAF misrepresented that its shingles met the ASTM D3462 standard, were of superior quality, were the heaviest shingles of their kind, could withstand harsh conditions and would last for the life of the 25-year warranty. GAF also knowingly sold shingles that it knew would not last the 25-year warranted life, were of inferior quality, were subject to cracking

problems, had numerous defects and did not comply with ASTM D3462 at the time of sale and installation. GAF nonetheless labeled the shingles as complying with the ASTM D3462 standard, representing that they were suitable for use in homes and other structures, included a 25-year warranty with them, and represented through its website and brochures that its shingles were long lasting and durable.

174.    Plaintiff reasonably relied on GAF's representations about compliance with ASTM standards, the quality of their shingles and the shingles' code compliance when deciding to install the GAF shingles with the express warranty. Plaintiff also believed that a 25-year shingle would be robust enough to provide roofing protection for that length of time.

175.    Because of GAF's conduct outlined herein, Plaintiff and class members did not know, and could not have known, that their shingles were made from substandard and defective materials, had a "cracking problem," and were the subject of "cracking team" investigations at the time of sale and installation, and did not comply with the ASTM D3462 requirements, as was claimed on the products' labels.

176.    GAF engaged in trickery and artifice to prevent Plaintiff and the class members from discovering the defects in Timberline shingles. The affirmative acts in which GAF engaged to conceal facts about the true quality of the shingles, through intentionally misleading advertising, labeling and marketing, were calculated to hinder discovery by ordinary diligence. GAF's affirmative misrepresentations involve acts of low moral turpitude, which could only be undertaken by a corporation intending to engage in illegal behavior to mislead consumers into purchasing a defective product.

177.    GAF's mislabeling of the Timberline shingles was an affirmative act that was intended to prevent, and did in fact prevent Plaintiff and members of the class from discovering

their potential claims. Because of the nature of concealment and the testing needed to discover non-compliance with ASTM D3462, Plaintiff and members of the class could not, even with the exercise of due diligence, have independently discovered their cause of action.

178.   To this day, GAF has continued this concealment and suppression by continuing to make representations about the superiority of its shingles, and failing to inform the public about the unsuitability of its Timberline shingles, the creation of its "cracking teams," its conclusion that it had been using substandard materials, and other deficiencies described herein.

179.   Based on this conduct and the allegations herein, GAF is estopped from relying on any statute of limitations or other time-related defense in this action. GAF affirmatively misrepresented and actively concealed through use of tactics designed to mislead, the true nature, character, and quality of the Timberline shingles and, for the reasons described herein, was under a continuous duty to disclose to Plaintiff and the class the facts it omitted and concealed. Plaintiff and the members of the class reasonably relied upon GAF's misrepresentations and active concealment in not sooner bringing the claims asserted herein.

180.   As a result of GAF's fraudulent concealment, equity requires that the statute of limitations on Plaintiff's and the class members' claims be tolled.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiff, on behalf of herself and all others similarly situated, prays for relief against GAF as follows:

1.   Certification of this matter as a class action and appointing Plaintiff and her counsel to represent the class;

2.   Compensation for damages suffered by Plaintiff and the class members;

3.   Award of reasonable attorneys' fees and costs and disbursements incurred herein;

4.   Award of additional damages, remedies and penalties available by law;

5. Requiring GAF to initiate a post-sale instruction and warning campaign, to conduct further testing, and to refrain from making unlawful representations about warranty claims;

6. Declaring the rights and obligations of the parties as prayed for; and

7. Such other and further relief the Court deems just and equitable.

### JURY TRIAL DEMAND

Plaintiff hereby demands a trial by jury.


Dated: August 4, 2011

_____
Patrick F. Madden
Lawrence Deutsch
Shanon J. Carson
BERGER & MONTAGUE, P.C.
1622 Locust Street
Philadelphia, PA  19103
Tel: (215) 875-4656
Fax: (215) 875-4604
Email: scarson@bm.net

Attorneys for Plaintiff